UNITED STATES DISTRICT COURT                    b
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

JANICE ANN MELDER               CIVIL ACTION 1:16-CV-00861

VERSUS                          JUDGE TRIMBLE

CAROLYN W. COLVIN,[1]           MAGISTRATE JUDGE PEREZ-MONTES
COMMISSIONER

---

## REPORT AND RECOMMENDATION

### I. Background

#### A. Procedural Background.

Janice Anne Melder ("Melder") filed an application for Social Security Income benefits ("SSI") on October 16, 2013 (Doc. 10-1, p. 175/462) and for Disability Insurance benefits ("DIB") (Doc. 10-1, p. 181/462), alleging a disability onset date of June 13, 2013 (Doc. 10-1, pp. 175, 181/462) due to Type 2 diabetes, high blood pressure, and anxiety disorder (Doc. 10-1, p. 211/462).    Those applications were denied by the Social Security Administration ("SSA") (Doc. 10-1, p. 87/462).

A *de novo* hearing was held before an administrative law judge ("ALJ") at which Melder appeared with her attorney, a witness, and a vocational expert ("VE") (Doc. 10-1, p. 14/462).  The ALJ found that Melder was insured through December 31, 2014, had not worked since June 13, 2013, and has severe impairments of an affective disorder (depression), diabetes, fibromyalgia, hypertension, and

---

[1] Carolyn Colvin was replaced by Acting Commissioner of Social Security Nancy A. Berryhill on January 23, 2017.

osteoarthrosis/allied disorders (Doc. 10-1, p. 71/462). The ALJ concluded that Melder can perform a limited range of light work, and can do work that exists in substantial numbers in the national and regional economies such as cleaner/polisher, silver wrapper, and sales attendant (Doc. 10-1, pp. 75, 80/462). The ALJ concluded that Melder was not disabled from June 13, 2013 through January 26, 2015 (the date of his decision (Doc. 10-1, pp. 80-81/462).

Melder requested review of the ALJ's decision, but the Appeals Council declined to review it (Doc. 10-1, p. 4/462), and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Melder next filed this appeal for judicial review of the Commissioner's final decision. Melder raises the following issues for review (Doc. 11):

1. Does the ALJ's decision conflict with the Social Security regulations regarding the weight given to medical evidence?

2. Did the Commissioner fail to meet the burden of proof with regard to step 5 of the sequential evaluation process?

The Commissioner filed a brief in response (Doc. 14), to which Melder replied (Doc. 15). Melder's appeal is now before the Court for disposition.

B.    **Medical Records.**

Melder completed high school and nursing school for a license practical nurse ("LPN") (Doc. 10-1, p. 212/462).

Melder was evaluated by Dr. James David at the Vascular Clinic Vein Care Center in September 2006 (Doc. 10-1, p. 328/462). Dr. David found Melder had varicose veins in both legs with edema, pain, and swelling, more on the left (Doc. 10-

2

1, p. 328/462).  Melder also had intense night cramps and fatigue (Doc. 10-1, p. 334/462).  Dr. David ordered a complete bilateral study with duplex scan, and prescribed support stockings (Doc. 10-1, p. 328/462).  There was no evidence of deep vein thrombosis, but the greater saphenous vein of the left leg showed valvular reflux, and Dr. David diagnosed insufficiency (Doc. 10-1, p. 339/462).

In November 2006, Dr. David noted the ultrasound testing showed venous insufficiency with reflux in the left leg (Doc. 10-1, p. 333/462).  Melder had been wearing the support stockings and had no significant edema (Doc. 10-1, p. 333/462).

In December 2006, Dr. David closed the greater saphenous vein of Melder's left leg to relieve her symptoms (Doc. 10-1, p. 334/462).  A follow-up ultrasound showed the vein was closed and there was no evidence of thrombosis (Doc. 10-1, p. 334/462).

By January 2007, Melder reported some soreness and tenderness, but her legs felt much better (Doc. 10-1, p. 341/462).  In November 2007, the venous duplex examination of Melder's left leg did not show any problems (Doc. 10-1, p. 344/462).

In November 2012, Melder again reported tenderness of the left lateral thigh and restless legs for four months (Doc. 10-1, p. 346/462).  Dr. David found varicose veins with pain and swelling (Doc. 10-1, p. 346/462).  Melder had pain and severe night cramps in both legs, and was not wearing her support stockings (Doc. 10-1, p. 346/462).  Ultrasound testing showed insufficiency in the right small saphenous vein, and Dr. David diagnosed varicose veins with pain and swelling (Doc. 10-1, p. 346/462).

3

In February 2013, Melder underwent a hysterectomy, bilateral salpingo-oophorectomy,[2] and cystoscopy (Doc. 10-1, p. 353/462). In May 2013, complained that she had begun having migraine headaches after her hysterectomy (Doc. 10-1, p. 392/462). She wore a hormone patch to try to regulate her hormones (Doc. 10-1, p. 392/462). Melder's blood pressure was 170/106 (Doc. 10-1, p. 392/462). Melder admitted she did not take blood pressure medicine on days when her blood pressure was down (Doc. 10-1, p. 392/462).

In June 2013, Melder went to the Marksville Family Care Center for medication refills and follow-ups for anemia and benign essential hypertension (Doc. 10-1, p. 377/462). Melder was 5'3" tall and weighed 214 pounds (Doc. 10-1, p. 377/462). Melder complained of anemia, generalized anxiety disorder, conjunctivitis, hypertension, sinusitis, gastroenteritis, and headache (Doc. 10-1, p. 377/462). She was prescribed Carvedilol and hydrochlorothiazide for her hypertension, Lortab for headaches, and Xanax for her anxiety disorder (Doc. 10-1, p. 379-80/462). It was noted that Melder had previously tried Imitrex, Topamax, Demerol, dilaudid, tramadol, toradol, domatol, and Lortab for her migraine headaches (Doc. 10-1, p. 390/462). Melder was prescribed Indapanide, and hydrocodone, and an EKG was scheduled (Doc. 10-1, p. 390/462).

In August 2013, Melder complained of bladder spasms for two days, and anxiety that was worse in the evening due to hip pain and unemployment (Doc. 10-1, p. 381/462). Melder was prescribed Methenamine-Naphos, Methylin, Hyoscyamine,

---

[2] Removal of both ovaries and fallopian tubes.

Indapamide, Ondanestron (for bladder spasms), and Xanax (for anxiety) (Doc. 10-1, p. 384/462).

In August 2013, Melder was evaluated by Dr. Daniel Oas, an osteopath (Doc. 10-1, p. 374/462). Melder was 5'6" tall and weighed 216 pounds (Doc. 10-1, p. 374/462). Melder was diagnosed with right hip adductor flexor strain and physical therapy was prescribed (Doc. 10-1, p. 374/462).

In July, August and November 2013, Melder was evaluated by Dr. Stephen Katz, a pain management doctor (Doc. 10-1, pp. 398, 401, 404/462). In July, Melder complained of right hip pain, neck pin on the left side, and headaches (Doc. 10-1, p. 404/462). Dr. Katz found Melder had right upper hip and left upper scapular pain, but normal motor strength and normal ranges of motion (Doc. 10-1, p. 405/462). Dr. Katz diagnosed enthesopathy[3] of the hip, migraine headaches, and fibromyalgia (Doc. 10-1, p. 407/462). Dr. Katz prescribed oxycodone, valium, Neurontin, and Mobic (Doc. 10-1, p. 407/462).

In August and November, Dr. Katz noted Melder's active problems of enthesopathy of the hip, systemic hypertension, fibromyalgia, migraine headache, and neck pain, for which she was taking clonidine, Coreg (carvedilol), Lexapro, Mobic (meloxicam), Neurontin (gabapentin), Norvasc (amlopidine), oxycodone, progesterone, Valium, Vasotec, Vivelle-Dot (hormone patch), and Xanax (Doc. 10-1,

---

[3] An enthesopathy refers to a disorder involving the attachment of a tendon or ligament to a bone. See Dorland's Medical Dictionary for Health Consumers (Saunders 2007) at https://medical-dictionary.thefreedictionary.com/enthesopathy.

p. 398, 401/462). Dr. Katz made no changes to Melder's treatment, except to prescribe a Medrol Dosepak in August 2013 (Doc. 10-1, p. 399, 402/462).

On January 22, 2014, Dr. James Quillin, Ph.D., M.P. evaluated Melder at the request of the state Disability Determinations (Doc. 10-1, p. 426/462). Dr. Quillin also had some of Melder's medical records. Dr. Quillin noted Melder's history of fibromyalgia, a previously fractured acetabulum that had developed osteoarthritis and remained painful, insulin-dependent diabetes, hypertension (Doc. 10-1, p. 426/462). Dr. Quillin found Melder was a depressed 43 year old who had substantial pain and multiple other medical problems (Doc. 10-1, p. 426/462). Dr. Quillin found Melder has generalized anxiety, her cognitive function was intact, and she was non-psychotic (Doc. 10-1, p. 427/462). Melder's sleep was compromised, and her appetite, interest, energy level, and social interaction were impaired (Doc. 10-1, p. 427/462). Dr. Quillin found Melder was capable of driving, her intellectual functioning was within normal limits, her mood was depressed, and her social functioning was diminished (Doc. 10-1, p. 427/462).

Dr. Quillin diagnosed major depression (single episode, moderate) and pain disorder secondary to her medical condition (Doc. 10-1, p. 427/462). Dr. Quillin thought it might be possible to adjust Melder's psychopharmacologic protocol to optimize her outcome, and found her capable of managing money (Doc. 10-1, p. 427/462).

On January 30, 2014, Lisette P. Constantin, Ph.D., evaluated Melder's mental health records at the request of state Disability Determinations. Dr. Constantin

concluded Melder suffers from an affective disorder that causes moderate difficulties in maintaining concentration, persistence or pace; mild restrictions in her activities of daily living; and mild difficulties in maintaining social functioning (Doc. 10-1, p. 45/462). Dr. Constantin found those limitations include moderate limitations in her: ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; ability to perform at a consistent pace without an unreasonable number and length of rest periods; and ability to respond appropriately to changes in her work setting (Doc. 10-1, pp. 48-49/462). Dr. Constantin further explained that Melder is not psychologically incapacitated by her symptoms of anxiety and depression (Doc. 10-1, p. 49/462).. Melder has the ability to understand, remember, and carry out semi-complex (1-4 step) and familiar complex instructions; can maintain concentration; can remember locations and work-like procedures; can maintain socially appropriate behavior in a work setting; can ask simple questions or request assistance; can accept instructions; can respond appropriately to criticism from supervisors; can get along with coworkers or peers; can work within a schedule; can maintain regular attendance; can make simple work-related decisions; can pay attention to details; and can remain alert and respond appropriately to changes in the work place (Doc. 10-1, p. 49/462).

In February 2014, Dr. Katz found Melder's fibromyalgia pain was controlled (Doc. 10-1, p. 437/462). In May and August 2014, Dr. Katz found Melder's hip pain and fibromyalgia were both controlled (Doc. 10-1, p. 434, 437/462).

In August 2014, Dr. Clois Slaughter diagnosed hypercholesterolemia, hypertension, edema, hyperglycemia, and diabetes mellitus, type II (Doc. 10-1, p. 442/462). Dr. Slaughter stopped the Coreg and prescribed Inderal for hypertension, prescribed Levemir Flexpen, Amaryl, and NovoPine for diabetes, refilled the Lexapro, and prescribed a Mini Ville hormone patch (Doc. 10-1, p. 442/462).

In September 2014, Melder was referred to Dr. Riad Hajmurad, a neurologist (Doc. 10-1, p. 450/462). Melder complained of symptoms suggestive of seizures for two years (a jolt in her head), neck pain radiating to her upper extremities with numbness and tingling, daily headaches, panic attacks, and difficulty sleeping at night (Doc. 10-1, p. 446/462). An EMG and a nerve conduction study did not show evidence of neuropathy, carpal tunnel syndrome, or active radiculopathy (Doc. 10-1, p. 450/462). Dr. Hajmurad found symptoms suggestive of possible partial type seizures and chronic headache, and prescribed Topamax (Doc. 10-1, p. 450/462). In October 2014, an electromyography and nerve conduction study showed no evidence of neuropathy or carpal tunnel, and minimal nonspecific cervical radiculopathy (Doc. 10-1, p. 445/462). In November 2014, an MRI of her brain was negative (Doc. 10-1, p. 454/462).

Melder saw George Haag, Psy.D. in September 2014 (Doc. 10-1, p. 446/462). Melder said she was staying in bed a lot and did not feel like doing anything (Doc. 10-1, p. 446/462). Dr. Haag found Melder was suffering from depression and anxiety, and recommended she begin engaging in one other activity, and plan a trip (Doc. 10-1, p. 446/462). In December 2014, Dr. Haag noted Melder had not been to

8

psychotherapy with him for three months (Doc. 10-1, p. 460/462).  Melder stated she believes she is bipolar, but Dr. Haag noted there were no apparent signs of mania (Doc. 10-1, p. 460/462).  He also found Melder is very passive aggressive (Doc. 10-1, p. 460/462).

In January 2015, Dr. Slaughter wrote that Melder has vascular compromise with recurrent leg edema for which she is prescribed Lasix and compression stockings (Doc. 10-1, p. 462/462).  Dr. Slaughter recommended that Melder elevate her legs in a position where her feet are above her heart (Doc. 10-1, p. 446/462).

## C.   Administrative Hearing

At her December 31, 2014 administrative hearing, Melder testified that she is 44 years old, 5'6" tall, 192 pounds, right-handed, and able to drive (Doc. 10-1, pp. 17-18/462).

Melder testified that she has sleepiness as a medication side-effect of Topamax, Oxycodone, and Xanax (Doc. 10-1, p. 18/462).  Lasix makes her urinate quite frequently, and sometimes Levemir (insulin) drops her blood sugar too much (Doc. 10-1, p. 18/462).  Melder testified that she tests her blood sugar at home, it is usually 170 to 174, and is rarely normal (Doc. 10-1, p. 18/462).  Dr. Slaughter frequently changes her medication for it (Doc. 10-1, p. 18/462).  Melder takes one shot per day plus oral medication (Doc. 10-1, p. 19/462).

Melder testified she has neuropathy in her feet due to diabetes (Doc. 10-1, p. 19/462).  Melder also has a possible seizure disorder that is being treated with Topamax (Doc. 10-1, p. 19/462).  Dr. Hajmurad told her she was having aura seizures

(Doc. 10-1, pp. 26-27)/462).  The seizures last less than a minute and Melder feels fine afterward, except for a headache (Doc. 10-1, pp. 27-28/462).  Melder does not lose consciousness when she has a seizure, and she remains aware of what is going on around her (Doc. 10-1, p. 27/462).  Melder can resume her activity almost immediately (Doc. 10-1, p. 28/462).  Melder testified that her seizures used to be almost daily but, since taking Topamax, her seizures occur once or twice a week (Doc. 10-1, p. 27/462).  Melder's son has grand mal seizures (Doc. 10-1, p. 27/462).

Melder testified that she is going to have an EEG due to her migraines, which she has every other day (Doc. 10-1, p. 19/462).  Topamax has also helped her migraines a little (Doc. 10-1, p. 19/462).

Melder testified that she cries easily and it is difficult for her to go into a store (Doc. 10-1, pp. 19-20/462).  Some days are good and some are bad (Doc. 10-1, p. 20/462).  Melder gets up in the morning and sits in the recliner, does a few chores, takes care of the dogs, washes clothes, does dishes, bathes and cares for herself, but rarely goes shopping (Doc. 10-1, p. 20/462).  Melder has gained weight, she has not maintained her relationships with other people, and she has panic attacks (Doc. 10-1, p. 20/462).  When Melder has a panic attack, she is nervous, upset, and cries (Doc. 10-1, p. 21/462).  Melder stays in her recliner more than in bed when she is depressed (Doc. 10-1, p. 24-25/462).  Melder has 14 to 15 bad days per month (Doc. 10-1, p. 26/462).  Melder's husband misses a lot of work to take care of Melder when she is depressed (Doc. 10-1, p. 26/462).  Melder said she sees Dr. Haag every month for her depression (Doc. 10-1, pp. 22-23/462).

Melder testified she broke her acetabulum (hip joint) in 2000 (Doc. 10-1, p. 21/462). Although it healed, her hip eventually started hurting and Dr. Oas told her she could have surgery, but there was no guarantee she would be pain-free after the surgery (Doc. 10-1, p. 21/462). Melder elected not to have surgery and instead did physical therapy (Doc. 10-1, p. 21/462). Melder can stand for about 20 minutes (Doc. 10-1, p. 21/462). She has to elevate her legs when she sits because they swell, but her support stockings help with the swelling (Doc. 10-1, p. 21/462). Melder also has poor circulation in her legs (Doc. 10-1, p. 21/462). Melder testified that her legs hurt, but her hip hurts worse (Doc. 10-1, p. 21/462).

Melder testified that she finished high school, then went to nursing school to become an LPN (Doc. 10-1, p. 22/462). Melder worked as an LPN for 24 years and stopped working in June 2013 (Doc. 10-1, p. 22/462).

She sees Dr. Slaughter for edema in her lower legs and wears compression hose (Doc. 10-1, p. 23/462). Melder admitted she does not wear the stockings at home, but only puts them on when she goes somewhere, which is rarely (Doc. 10-1, p. 23/462). At home Melder does not walk around often or for long (Doc. 10-1, p. 23/462). Melder has her feet elevated above her heart about 50% of the time that she spends sitting (Doc. 10-1, p. 24/462).

Melder testified that her husband, who is also a nurse, does the shopping (Doc. 10-1, p. 25/462). Melder and her husband both do the cleaning, vacuuming, and sweeping, and her husband does most of the cooking (Doc. 10-1, p. 25/462). Melder does not have any social activities (Doc. 10-1, pp. 25-26/462).

11

Melder's husband, Jimmy Melder ("Jimmy") testified he has been married to Melder since 2011, and has worked as a registered nurse at the Veterans' Hospital for 22 years (Doc. 10-1, p. 29-30/462). Jimmy testified that, in 2014, he used all of his sick leave and annual leave, and had about 400 hours of leave without pay, to take care of Melder (Doc. 10-1, p. 29-30/462). Jimmy testified he needs to stay home with Melder when she is hurting (Doc. 10-1, p. 30/462). Jimmy's bosses have been very lenient but it is difficult for him (Doc. 10-1, p. 31/462).

Jimmy testified Melder is very depressed and gets angry when she cannot do things like sit through a movie (Doc. 10-1, pp. 30-31/462). Jimmy testified that, when Melder is in pain, she has to get up and move around, and then she has a panic attack (Doc. 10-1, p. 31/462). Jimmy also testified that he does most of the grocery shopping, and has learned to cook (Doc. 10-1, p. 31/462). Melder used to love to cook, but seldom does so now (Doc. 10-1, p. 31/462).

The VE testified that Melder's past work as an LPN was medium, SVP 6, DOT 079.374-014 (Doc. 10-1, p. 32/462).

The ALJ posed a hypothetical involving a person of Melder's age, education, and work experience, who can do light work except she is limited to work that is simple, routine, repetitive, with only one or two step instructions, a work environment free of any fast-paced production requirements, involves only simple work-related decisions, and has few work place changes (Doc. 10-1, p. 33/462). The VE testified that such an individual would not be able to do Melder's past work as an LPN because is it medium work (Doc. 10-1, p. 33/462). However, such a person could

12

work as a cleaner/polisher (light, SVP 2, DOT 079.687-010, OED 51-9198) (5800 jobs nationally and 90 in Louisiana); silver wrapper (light, SVP 1, DOT 318.687-018, OES 35-9021) (106,165 jobs nationally and 1,100 jobs in Louisiana); or a sales attendant (light, SVP 2, DOT 299.677-010, OES 41-2031) (208,000 jobs nationally and 2,800 jobs in Louisiana) (Doc. 10-1, p. 33/462).

The ALJ posed a second hypothetical which incorporated the first hypothetical with the additional requirement that Melder be able to elevate her lower extremities during 50% of the work day (Doc. 10-1, p. 33/462). The VE testified there are no jobs that such a person can do (Doc. 10-1, p. 33/462).

D.   <u>ALJ's Findings</u>

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether Melder (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. <u>See</u> <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120 (1995) (citing <u>Lovelace v. Bowen</u>, 813 F.2d 55, 58 (5th Cir.1987)).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled.  Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis.  Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy.  See Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Melder has not engaged in substantial gainful activity since June 13, 2013, her disability insured status expired after December 31, 2014, and she has severe impairments of an affective disorder (depression), diabetes, fibromyalgia, hypertension, and osteoarthrosis/allied disorders, but she does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Doc. 10-1, p. 71/462).  The ALJ also found that Melder is unable to perform her past relevant work as an LPN (Doc. 10-1, p. 79/462).

At Step No. 5 of the sequential process, the ALJ further found that Melder has the residual functional capacity to perform light work except she is limited to simple, routine, repetitive tasks and work requiring simple decisions and few changes, and no fast-paced production-type work (Doc. 10-1, p. 75/462).  The ALJ found Melder is a younger individual with at least a high school education and transferability of work skills is immaterial (Doc. 10-1, p. 79/462).  The ALJ concluded there are a significant number of jobs in the national economy that Melder can perform, such as cleaner/polisher, silver wrapper, and sales attendant and, therefore, Melder was not

disabled as defined in the Social Security Act at any time from June 13, 2013 through the date of the ALJ's decision on January 26, 2015 (Doc. 10-1, pp. 80--81/462).

II.    <u>Law and Analysis</u>

    A.    <u>Scope of Review</u>

In considering Social Security appeals, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors.  <u>See</u> <u>McQueen v. Apfel</u>, 168 F.3d 152, 157 (5th Cir. 1999).  For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance.  <u>See</u> <u>Falco v. Shalala</u>, 27 F.3d 160, 162 (5th Cir. 1994) (citing <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)).  Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision, but must include a scrutiny of the record as a whole.  The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.  <u>See</u> <u>Singletary v. Bowen</u>, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder.  <u>See</u> <u>Fraga v. Bowen</u>, 810 F.2d 1296, 1302 (5th Cir. 1987); <u>Dellolio v. Heckler</u>, 705 F.2d 123, 125 (5th Cir. 1983).  The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court.  <u>See</u> <u>Allen v. Schweiker</u>, 642 F.2d 799, 801 (5th Cir. 1981); <u>see also</u> <u>Anthony v. Sullivan</u>, 954 F.2d 289, 295 (5th

Cir. 1992).  The court does have authority, however, to set aside factual findings that are not supported by substantial evidence and to correct errors of law.  <u>See</u> <u>Dellolio</u>, 705 F.2d at 125.  But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence."  <u>See</u> <u>Johnson v. Bowen</u>, 864 F.2d 340 (5th Cir. 1988); <u>Dellolio</u>, 705 F.2d at 125.

## B.    The ALJ's finding that Melder can do light work is not supported by substantial evidence.

Melder contends the ALJ's decision conflicts with the Social Security regulations with regard to the weight given to medical evidence.  Specifically, Melder argues the ALJ's decision conflicts with SSR 96-2p[4] because the ALJ gave no weight to the opinion of the treating physician, Dr. Slaughter.  Melder contends she was prejudiced by this because the ALJ did not acknowledge the limitation imposed by Dr. Slaughter of elevating her legs when she sits.

A claimant's impairments may cause physical or mental limitations that affect what he can do in a work setting.  Residual functional capacity is a medical assessment, based upon all of the relevant evidence, of the work a claimant can perform despite his or her limitations.  <u>See</u> 20 C.F.R. §404.1545, §416.945.  Although the burden of proof in a disability case is on the claimant to show that he is unable to perform his usual line of work, once that fact is established, the burden shifts to the

---

[4] Melder also mentioned SSR 96-6p, 1996 WL 374180, "Consideration of Administrative Findings of Fact by State Agency Medical and Psychological Consultants and Other Program Physicians and Psychologists at the Administrative Law Judge and Appeals Council Levels of Administrative Review; Medical Equivalence," but did not argue it.

16

Commissioner to show that the claimant is able to perform some other kind of substantial work available in the national economy. See Herron v. Bowen, 788 F. 2d 1127, 1131 (5th Cir. 1986); see also Babineaux v. Heckler, 743 F.2d 1065, 1067 (5th Cir. 1984). The Commissioner has the burden to establish a claimant's residual functional capacity. See Leggett v. Chater, 67 F.3d 558, 565 (5th Cir. 1995); see also Myers v. Apfel, 238 F.3d 617, 620 (5th Cir. 2001).

> Section 404.1527(d) and 416.927(d) of 20 C.F.R. state:
>
> (d) How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
> > (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

See also SSR 96-2p.

Ordinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability. See Myers v. Apfel, 238 F.3d 617, 621 (5th Cir.2001) (citing Greenspan v. Shalala, 38 F.3d at 237); see also See Giles v. Astrue, 433 Fed. Appx. 241, 246–47 (5th Cir .2011) (citing Newton v. Apfel, 209 F.3d 448, 455 (5th Cir. 2000); Loza, 219 F.3d at 395. However, these opinions are not conclusive, and the ALJ must decide the claimant's status. See Myers, 238 F.3d at 621 (citing Greenspan, 38 F.3d at 237). Accordingly, when good cause is shown, less weight, little weight, or even no weight may be given to the physician's testimony. The good cause exceptions we have recognized include

17

disregarding statements that are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence.  See *id.; see also* Leggett v. Chater, 67 F.3d 558, 566 (5th Cir. 1995) (rejecting an "isolated, conclusory statement" of a treating physician when considered in conjunction with other opinions, objective medical evidence, and claimant's own testimony).

If a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [the Commissioner] will give it controlling weight."  See Giles, 433 Fed. Appx. at 246-47 (citing 20 C.F.R. § 404.1527(d)(2)). Likewise, when a treating physician has reasonable knowledge of the impairment, his opinion is given more weight than an opinion from a non-treating physician.  See *id.*  In contrast, the Commissioner may give less weight to a treating physician's opinion about a condition outside his area of expertise.  See *id.*  Treating physicians' opinions also receive greater weight "[w]hen the treating source has seen the claimant a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment."  See *id.*  The weight given to opinions from nonexamining physicians depends on "the degree to which they provide supporting explanations for their opinions."  See *id.*

The ALJ found there are no objective medical findings to support Melder's allegation that she must stay in bed or a recliner 14-15 days per month due to her mental and physical impairments.  The ALJ noted that no physician had imposed

18

limitations with regard to Melder'a activities, with the exception of the recommendation that she elevate her legs during the day to help with swelling (Doc. 10-1, p. 78/462). The ALJ rejected that limitation, reasoning:

> There is no objective evidence indicating that the claimant's hypertension and diabetes are unable to be controlled with proper medication and diet. There has been no mention from her treating physicians that she has experience end organ damage as a result of these conditions. Although the claimant had a history of an acetabular fracture 12 years ago, she reported to Daniel Oas, D.O. on August 6 that she had intermittent pain, which had increased in the front of the right hip. She denied body pain or low back pain. She denied having a limp or numbness or tingling of her toes. The claimant stated her right hip only bothered her if she performed certain activities.

The ALJ did not mention Melder's vascular problems, which cause pain and edema in her legs, for which she has already had one surgery, and which are the reason she has support stockings and takes Lasix. Instead, the ALJ focused solely on Melder's hypertension and diabetes. Therefore, the ALJ noted but did not discuss the requirement that Melder elevate her legs when sitting. Therefore, the ALJ failed to take into account all of Melder's impairments when evaluating her residual functional capacity.[5]

---

[5] It is also noted the ALJ failed to discuss Melder's obesity and its impact, in combination with her other impairments, on her ability to work. Obesity can reduce an individual's occupational base for work activity in combination with other ailments. See Beck v. Barnhart, 205 Fed. Appx. 207, (5th Cir. 2006). The combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately. See SSR 02-1p, "Evaluation of Obesity," 2002 WL 34686281 at *1. An ALJ is required to evaluate the impact of the claimant's obesity on her overall condition when determining disability. See Scott v. Heckler, 770 F.2d 482, 486-87 (5th Cir. 1985); see also **Error! Main Document Only.**Barrett v. Barnhart, 355 F.3d 1065, 1068 (7th Cir. 2004), on rehearing, 368 F.3d 691 (7th Cir. 2004) (ALJ erred in failing to consider the interaction between claimant's arthritis and her obesity, and did not explain why he found she could stand for two hours at a time); Matthews v. Astrue, 2011 WL 3820052, *5 (N.D. Tex. 2011) ("Nothing beyond the ALJ's boilerplate statement that he considered Plaintiff's obesity indicates he actually evaluated the effects obesity may have on Plaintiff's other impairments.").

Since the ALJ failed to evaluate all of Melder's impairments and their effects on her residual functional capacity, the ALJ's finding that Melder can perform light work is not supported by substantial evidence.

Since substantial evidence does not support the conclusions of the ALJ and the Appeals Council, their decision is incorrect as a matter of law.  However, this does not entitle Melder to a decision in her favor based on the existing record.  The record is simply inconclusive as to whether Melder can perform her past relevant work and as to whether there are any jobs existing in sufficient numbers in the regional or national economies that Melder can perform, given her true impairments.  Therefore, Melder's case should be remanded to the Commissioner for further proceedings.

C.    **The ALJ's findings as to Melder's residual functional capacity are not supported by substantial evidence.**

Melder next contends the Commissioner failed to meet the burden of proof with regard to step 5 of the sequential evaluation process.  Melder argues the ALJ relied on "faulty VE testimony."  Melder contends the VE erred in finding she can work as a silver wrapper (reasoning level 2) or a sales attendant (reasoning level 3), neither of which comports with the requirement that Melder do only "simple, routine, repetitive work with only one or two-step instructions."   Melder further argues that work as a cleaner/polisher does not exist in significant numbers in the regional economy.[6]

---

[6] Melder admits these arguments were not raised at the administrative hearing.  However, Melder contends the VE's testimony is in direct, or apparent, conflict with the <u>DOT</u> and, therefore, was contrary to his duty to present testimony that is consistent with the <u>DOT</u>.  <u>See</u> Doc. 10-1, p. 32/462.

Reasoning level 3 is defined as the ability to apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form, and deal with problems involving several concrete variables in or from standardized solutions. Level 2 reasoning requires the worker to apply commonsense understanding to carry out detailed but uninvolved written or oral instructions and deal with problems involving a few concrete variables in or from standardized situations. Level 1 reasoning requires the worker apply commonsense understanding to carry out simple one- or two-step instructions, and deal with standardized situations with occasional or no variables in or from these situations encountered on the job. See Dictionary of Occupational Titles, Appendix III, *at* http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

The ALJ's finding that Melder can perform jobs involving reasoning levels 2 and 3 is inconsistent with the ALJ's finding that Melder's residual functional capacity limits her to level 1 reasoning work involving "simple, routine, repetitive work with only one or two-step instructions." Therefore, the ALJ erred in finding Melder can work as a "silver wrapper" or a "sales attendant."

Melder also argues the job as cleaner/polisher does not exist in significant numbers in the regional economy. Pursuant to 42 U.S.C. § 423(d)(2)(A) and 20 C.F.R. § 404.1566,[7] work exists in significant numbers in the national economy if it exists in

---

[7] 20 C.F.R. § 404.1566(a) and § 416.966(a) state:

> General. We consider that work exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country. It does not matter whether—
> > (1) Work exists in the immediate area in which you live;
> > (2) A specific job vacancy exists for you; or

significant numbers either in either the region where the claimant lives or in several other regions of the country.   Lirley v. Barnhart, 124 Fed. Appx. 283, 283-84 (5th Cir. 2005).   Therefore, it is irrelevant that there are only 90 jobs as a cleaner/polisher in Louisiana, since there are 5800 jobs in the national economy (a number that Melder has not challenged as insignificant).[8]

Therefore, the jobs of silver wrapper and sales attendant do not comport with the ALJ's findings as to Melder's residual functional capacity, but the job as cleaner/polisher does.

However, the VE's testimony is based on hypotheticals using the ALJ's findings as to Melder's residual functional capacity.   Since those findings are not supported by substantial evidence, the hypotheticals are erroneous and VE's testimony cannot support the conclusion that there are jobs Melder is able to do.

Therefore, the Commissioner's decision should be vacated and the case should be remanded.

## III.   Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that the final decision of the Commissioner be VACATED and the case be REMANDED to the Commissioner for further proceedings consistent with the views expressed herein.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar

---

(3) You would be hired if you applied for work.

[8] The term "significant numbers" is defined loosely by negative implication: "Isolated jobs that exist only in very limited numbers in relatively few locations outside the region where you live are not considered 'work which exists in the national economy.'"   See 20 C.F.R. § § 404.1566(b) and § 416.966(b).   Melder has not argued whether 5800 jobs nationally is a significant number.

days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  No other briefs (such as supplemental objections, reply briefs, etc.) may be filed.  Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this 15th____ day of December, 2017.

Joseph H.L. Perez-Montes
United States Magistrate Judge